# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PANAMA CITY DIVISION

TAYLOR AUSTIN RYAN,

     Plaintiff,

v.                                       Case No. 5:17-cv-54-TKW/MJF

J ALVAREZ and GREGG POYTHRESS,

     Defendants.

_____/

## REPORT AND RECOMMENDATION

This prisoner civil rights case, filed under 42 U.S.C. § 1983, is before the court on Defendant Dr. Jorge Alvarez and Defendant Gregory Poythress's motion for summary judgment. (Doc. 60). Ryan has not responded to the motion, despite the undersigned having provided him an opportunity to do so. (Doc. 63). The undersigned recommends that Defendants' motion for summary judgment be granted.[1]

---

[1] The case was referred to the undersigned to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b); Fed R. Civ. P. 72(b).

## I.    Procedural Background

On February 15, 2017, Ryan initiated this action by filing a civil rights complaint under 42 U.S.C. § 1983. (Doc. 1 at 1). At that time, Ryan was a prisoner confined at Graceville Correctional Facility in Graceville, Florida. Ryan subsequently filed an amended complaint alleging Eighth Amendment claims for deliberate indifference to a serious medical need. (Doc. 13). He sued three Defendants—Dr. Jorge Alvarez, Veronika Newman, and Gregory Poythress—who provided healthcare services at the Graceville Correctional Facility ("Graceville"). (Doc. 1).

On January 12, 2018, the three Defendants filed a motion to dismiss for failure to state a claim. (Doc. 35). On June 12, 2018, Magistrate Judge Charles J. Kahn, Jr., recommended that Ryan's Eighth Amendment claim against Newman be dismissed and the matter be referred for further proceedings on Ryan's Eighth Amendment claim against Defendants Poythress and Alvarez. (Doc. 44). *See Ryan v. Poythres*,[2] *et al.*, 2018 WL 4113373, at *6 (N.D. Fla. June 12, 2018), *adopted by* 2018 WL 4107908 (N.D. Fla. Aug. 29, 2018).

Ryan alleges that Poythress and Alvarez ignored his medical conditions, failed to provide treatment for previously-diagnosed conditions, made medical judgments

---

[2] *See* Docs. 36, 40 confirming that the correct spelling is "Poythress."

"so bad that its [sic] not even medical and no other health care professional would make," delayed medical treatment, and interfered with the treatment of his treating physicians. (Doc. 13 at 9). For their part, Defendants argue that Ryan has failed to create a genuine issue of material fact regarding his claim of deliberate indifference to a serious medical need.

## II.    Material Facts Taken in the Light Most Favorable to Plaintiff

Ryan claims that he suffers from "hypogonadism and abnormal monocyte, lymph, and eosinophils[.]" (*Id.* at 5). His symptoms include "pain and shrinking of the testicles, loss of muscle, fatigue, arthralg[ia], infertility, depression, growth problems, and not even feeling like a man." (*Id.*). He previously was "diagnosed and treated with medicine for this condition due to its severity." (*Id.*). Ryan also purportedly suffers from chronic knee pain and migraines related to a traumatic brain injury.

On August 17, 2016, Defendant Poythress, who is an advanced practicing registered nurse, examined Ryan. (Docs. 58-2 at 121; 59-2 at 2 ¶ 10). Poythress noted that Ryan's vital signs were stable, he exhibited no acute distress, and his cane-assisted gait was steady. (Docs. 58-2 at 121; 59-2 at 2 ¶ 10). Pending review of Ryan's medical records and based on what Ryan told Poythress, Poythress initially diagnosed Ryan as suffering from a torn ACL/MCL in his left knee. (Docs. 58-2 at

121; 59-2 at 2 ¶ 10). Poythress prescribed Nortriptyline—which is pain medication and an anti-depressant—and issued a pass and an order for a knee brace. Poythress also instructed Ryan to sign a "release and request" so that he could obtain Ryan's medical records from outside medical providers, and Poythress ordered a follow-up visit. (Docs. 58-2 at 120-21; 58-3 at 10; 59-2 at 2 ¶ 10).

On September 30, 2015, Ryan filed a sick call requesting to speak with Dr. Gonzalez about his torn ACL and torn meniscus in his knee, his brain and spinal injury, and his hypogonadism. (Doc. 58-2 at 111). Ryan wanted to talk to Dr. Gonzalez about his medical records, the pain he was having, and the possibility of surgery. (*Id.*). On November 15, 2016, Dr. Yelton issued an order for Ryan to receive Neurontin at a dosage of 100 mg twice per day for 90 days. (Doc. 58-3 at 9). On December 6, 2016, Ryan refused all medication. (Doc. 58-2 at 103). On December 13, 2016, Dr. Yelton increased Ryan's prescription for Neurontin to 150 mg twice per day for 90 days. (Doc. 58-3 at 9).

On December 14, 2016, Poythress examined Ryan and noted that Ryan had stable vital signs and was not in acute distress. (Docs. 58-2 at 101; 59-2 at ¶ 11). During that visit, Poythress and Ryan also discussed Ryan's knee brace—which Ryan received at least by November 18, 2016—and his complaints of hypogonadism from steroid abuse. (Docs. 58-2 at 101; 59-2 at ¶ 11). Poythress's assessment was

that Ryan suffered from a torn ACL/MCL and hypogonadism secondary to steroid use. (Docs. 58-2 at 101; 59-2 at ¶ 11). The care plan included: obtaining a release form for any medical records not yet received, obtaining x-ray images of Ryan's left knee, and obtaining lab analysis of Ryan's testosterone level. (*Id.*). Poythress prescribed Ibuprofen and advised Ryan to return for a follow-up appointment in two weeks. (*Id.*). On December 21, 2016, Dr. Yelton increased Ryan's dosage of Neurontin from 150 mg to 200 mg twice per day. (Doc. 58-3 at 8).

On December 27, 2016, Ryan filed a sick call request seeking information regarding the x-ray image of his knee, the lab results, and whether the outside medical records had been received. (Doc. 58-2 at 96). He also wanted an HIV test. This request was received on December 28, 2016, but Ryan refused to be seen for sick call. (*Id.*). On December 29, 2016, Dr. Alvarez examined Ryan, and Ryan did not have any acute symptoms at that time. (Docs. 58-2 at 95; 59-1 at ¶ 12). The treatment plan was to continue with the existing treatment plan and follow-up as needed. (Doc. 58-2 at 95).

On January 5, 2017, Ryan's blood was drawn to determine his quantity of testosterone. (Doc. 58-2 at 93). Also, on January 5, 2017, Ryan filed a sick-call seeking a medical shoe pass and Ibuprofen for pain. (Doc. 58-2 at 92). This sick call request was received on January 9, 2017.

On January 9, 2017, Dr. Alvarez reviewed Ryan's lab results. (Doc. 59-1 ¶ 14). The quantity of Ryan's total testosterone was 530 ng/dl (reference interval 348-1197), and the quantity of his free testosterone 8.7 pg/ml (reference interval 9.3-26.5). (*Id.*; Doc. 58-4 at 8). According to Dr. Alvarez, the normal range of free testosterone in males between the age of 25 and 29 is 5.05 to 19.8 pg/ml. (Doc. 59-1 ¶ 14). Additionally, Dr. Alvarez indicated that the level of free testosterone is dependent on the levels of sex hormone binding globulin and albumin. Thus, luteinizing hormone (LH) and follicle-stimulating hormone (FSH) levels are tested along with Prolactin in assessing potential hypogonadism. (*Id.*). Based on these values, Dr. Alvarez concluded that Ryan's "hormone levels were in the normal range and given [Ryan's] lack of clinical symptoms, treatment was not indicated." (*Id.*).

On January 10, 2017, Nurse Matheny responded to Ryan's January 9, 2017, sick call request. (Doc. 58-2 at 90-91). Nurse Matheny noted that Ryan's chief complaint was "boots needed," and that Ryan reported left knee pain and a history of dislocation. (*Id.* at 90). Nurse Matheny noted that Ryan was taking Neurontin, Ibuprofen, and Abilify. (*Id.*). Nurse Matheny referred Ryan's chart to a clinician to determine whether a pass for a boot should be issued. (*Id.*). Poythress completed a review of Ryan's record and indicated that Ryan should return to the clinic for an evaluation. (Doc. 58-2 at 89).

On January 11, 2017, Ryan filed an emergency medical request regarding left knee pain. The nurse noted that Ryan's complaint regarding his left knee pain was not a medical emergency and instructed Ryan to access sick call as needed. (Doc. 58-2 at 87-88).

On January 12, 2017, Ryan's blood was again drawn to evaluate his testosterone levels. (Doc. 58-2 at 85). On January 17, 2017, Dr. Alvarez reviewed the results of the January 12 blood draw. Dr. Alvarez concluded that, in light of Ryan's LH, FSH, and prolactin levels, Ryan's hormone levels were "in the normal range and given [Ryan's] lack of clinical symptoms[,] treatment for hypogonadism was not indicated." (*Id*. at 4 ¶ 16).

On January 20, 2017, Poythress saw Ryan "to discuss his request for boots." (Docs. 58-2 at 83; 59-1 at ¶ 17; 59-2 at ¶ 16). Poythress noted that Ryan had a knee brace, exhibited stable vital signs, and had a steady gait. (Doc. 58-2 at 83). Poythress denied Ryan's request for "a boot pass" because there was "no medical indication" that it was necessary. (*Id*.). Ryan also mentioned he should not be given Ibuprofen because he had a history of kidney failure. (Doc. 13 at 6). Poythress advised Ryan to return for a follow-up and ordered Naproxen and a knee brace for Ryan's complaints "of chronic pain in [his] back, left knee, head, right ankle, and left arm."

Poythress also discontinued the previously prescribed Ibuprofen. (Docs. 58-2 at 83; 58-3 at 7).

According to Ryan, Poythress also discussed the lab analyses of Ryan's blood. Poythress informed Ryan that his free testosterone level was 8.7 on the first lab and 8.5 on the second set of labs. (Doc. 13 at 5). Ryan asserts that normal free testosterone levels range from 9.3 to 26. (*Id.*). Although Ryan told Poythress that his testosterone levels were "affecting [his] daily living" and could cause infertility, Poythress said he "would not treat [Ryan] for these levels" and that Ryan was "fine." (*Id.* at 6).

On January 29, 2017, Ryan completed a sick-call indicating that he had knee pain and migraines. He requested an appointment with Dr. Alvarez before sending a formal grievance to Tallahassee and CCS. (Doc. 58-2 at 82). This request was received on January 30, 2017. On January 31, Ryan refused sick call medical services. (*Id.* at 83).

On February 1, 2017, Ryan completed a sick call request for severe migraines. (*Id.* at 80). This request was received on February 3, 2017. (*Id.*). On February 6, 2017, Nurse Bryson examined Ryan. (*Id.* at 79). Ryan complained of leg pain and migraines. Nurse Bryson noted that Ryan was seen on January 20, 2017 for boots, he had a follow-up appointment scheduled, there was no indication of migraines in

the record, and Ryan did not complain of a headache during the evaluation. (Doc. 58-2 at 79). The assessment was questionable migraine, and the notes indicate that headaches would be addressed at Ryan's follow-up appointment.

On February 7, 2017, Ryan filed a sick call stating, "My testicles have been aching and extremely sore, they also have been shrinking." (Doc. 58-2 at 78). The request was received on February 8, 2017. On February 9, 2017, Nurse Carter responded to the sick call. (Doc. 58-2 at 76-77). Ryan complained of frequent urination and testicular pain. (*Id.* at 76). Nurse Carter took vital signs and tested Ryan's blood sugar. Nurse Carter instructed Ryan to collect a clean urine specimen, increase his fluid intake, and to return if he was unable to urinate for 12 hours, or sooner if his bladder felt full and painful or if symptoms remained, worsened, or Ryan developed additional symptoms. (*Id.* at 77). On February 9, 2017, Poythress reviewed Ryan's chart and noted that his "labs" were within normal limits. (*Id.* at 75). On February 14, 2017, Dr. Yelton again increased Ryan's dosage of Neurontin. (Doc. 58-3 at 7).

On February 20, 2017, Ryan filed a sick call stating "I keep peeing every hour and 4x night. I also have pain in my testicles. This is my second request." (Doc. 58-2 at 74). The request was received on February 21, 2017. On February 21, 2017,

Ryan filed a sick call regarding left knee pain and migraines, which was received on February 23, 2017. (Doc. 58-2 at 70).

On February 22, 2017, Poythress saw Ryan for a follow-up "regarding his complaints of hypogonadism." (Docs. 58-2 at 71; 59-2 ¶ 17). Poythress noted that Ryan was not receiving treatment at that time, no medical records from outside treaters had been received, and Ryan was seeking hormone replacement therapy. (Docs. 58-2 at 71; 59-2 ¶ 17). Poythress explained to Ryan that his lab results were within normal limits. (Doc. 59-2 at ¶ 17). Based on Ryan's reported history, Poythress's assessment was "possible hypogonadism secondary to steroid use." (Docs. 58-2 at 71; 59-2 ¶ 17). Poythress did not observe objective signs of hypogonadism such as hair loss, growth problems, fatigue, muscle loss, erectile dysfunction, or arthralgia. (Doc. 59-2 at ¶ 17). But Poythress ordered additional lab work. (Docs. 58-3 at 6; 59-2 at ¶ 17). Poythress advised Ryan to return for a follow-up appointment in two weeks to discuss possible treatment. (Docs. 58-2 at 71; 59-2 ¶ 17).

On February 24, 2017, Nurse Carter responded to Ryan's February 21, 2017 sick call request. (Doc. 58-2 at 68-69). Nurse Carter examined Ryan and noted that Ryan's chief complaint was pain in the left knee, but no swelling, deformity, or

numbness was present. Nurse Carter instructed Ryan to elevate his leg and take Ibuprofen or Acetaminophen for pain.

On February 28, 2017, Dr. Alvarez reviewed Ryan's chart and noted a history and prior treatment for erectile dysfunction and a motorcycle accident. (Doc. 58-2 at 67). Ryan was scheduled for a follow-up appointment to discuss his lab results and a possible endocrinology referral. (*Id.*; Doc. 59-1 ¶ 20). On March 6, 2017, Ryan's blood was drawn again to measure his testosterone levels. (Doc. 58-2 at 66).

On March 9, 2017, Ryan appeared for an appointment to discuss the results on the testosterone levels from March 6, 2017. (Docs. 58-2 at 65; 59-1 at 5 ¶ 21-22). The results were not available. (*Id.*). Dr. Alvarez examined Ryan for possible hypogonadism and complaints related to a motor vehicle accident including "knee ligaments," "head trauma, and headache migraines." (Docs. 58-2 at 65; 59-1 at ¶ 22). Dr. Alvarez noted that Ryan had a soft abdomen and non-tender genitals. (Doc. 58-2 at 65). Dr. Alvarez also noted that there was no indication that Ryan's genitals were smaller than normal. (Doc. 59-1 at ¶ 22). Ryan also did not exhibit any objective signs of hair loss, growth problems, fatigue, muscle loss, erectile dysfunction, or arthralgia other than his knee pain. (*Id.*). Dr. Alvarez assessed possible hypogonadism and "derangement of left knee ligament." (Docs. 58-2 at 65; 59-1 at ¶ 22). On March 9, 2017, Dr. Alvarez prescribed Excedrin Migraine, a knee

brace, physical therapy, and "issued passes for a low bunk, boots, and no prolonged standing greater than 25 minutes." (Docs. 58-2 at 65; 59-1 at ¶ 22). Ryan told Dr. Alvarez about his "history of kidney failure and how the brace puts pressure on [his] osteochondroma," but Alvarez purportedly "told [Ryan] that's all he could do and that [Ryan] wasn't in pain it's just [Ryan's] imagination." (*Id.*).

On March 13, 2017, Dr. Alvarez "conducted a chart review and reviewed the lab results following the most recent blood draw." (Docs. 58-2 at 63; 58-4 at 6; 59-1 at ¶ 23). The lab results indicated that Ryan's hormone levels were within a normal range. (Doc. 59-1 at ¶ 23). Dr. Alvarez concluded that Ryan was not suffering from primary or secondary hypogonadism. (Docs. 58-2 at 63; 59-1 at ¶ 23). Based on the objective results and the lab results, Dr. Alvarez determined that treatment for hypogonadism was unnecessary. (Docs. 58-2 at 61; 59-1 at ¶ 23).

On March 16, 2017, Poythress discussed the lab results with Ryan, explaining that the results were normal and did not indicate "primary or secondary hypogonadism." (Docs. 13 at 6; 58-2 at 61; 59-2 at ¶ 22). Poythress purportedly "stated that he was going to ignore the first two labs results and get rid of them." (*Id.* at 7). Ryan asked Poythress "not to ignore the first two out of range results, but [Poythress] told [Ryan] not to worry about those results because he wasn't." (Doc. 13 at 6). Poythress advised Ryan "to return to the clinic as needed." (*Id.*).

On March 23, 2017, Dr. Alvarez examined Ryan after Ryan complained of weakness and having low testosterone levels. (Docs. 58-2 at 58, 59-1 at ¶ 25). Alvarez advised Ryan that the most recent testosterone lab results were within a normal range. (Docs. 13 at 7; 59-1 at ¶ 25). When Ryan asked to see a specialist, Dr. Alvarez put a referral in and informed Ryan that a referral for a consult would require medical director approval. (Docs. 58-2 at 58, 59 at ¶ 25). Dr. Alvarez advised Ryan to follow up in 3.5 weeks and ordered lab tests to be repeated in three months. (Docs. 58-2 at 58; 58-4 at 5; 59-1 at ¶ 25).

At this appointment, Ryan also requested treatment for his "torn medial collateral ligament and torn [meniscus]." (Doc. 13 at 7). Ryan "explained the pain and that the Ibuprofen wasn't helping and that with [his] history of kidney failure [he] shouldn't be taking NSAIDs." (*Id.*). He asked Dr. Alvarez "to listen to the crunching sound when [Ryan] extend[ed] the knee but [Alvarez] refused." (*Id.*). After Ryan described migraines and pain in other parts of his body, Dr. Alvarez purportedly said, "he could [do] nothing but give [Ryan] naproxen and Excedrin[.]" (*Id.* at 7-8). Ryan notes "both are NSAIDs and are hard on the kidneys;" Ryan also advised Dr. Alvarez those medications "do not touch the pain," but Dr. Alvarez allegedly "ignored" Ryan's complaints. (*Id.* at 8).

On March 29, 2017, Dr. Alvarez submitted a request for an endocrinology consult. (Docs. 58-2 at 58; 59-1 at ¶ 26). On April 6, 2017, the medical director deferred the request. (Docs. 58-2 at 57; 59-1 at ¶ 27). On April 19, 2017, Dr. Alvarez advised Ryan that the consultation was deferred. (Docs. 13 at 8; 58-2 at 56; 59-1 at ¶ 28). Dr. Alvarez advised Ryan that he would continue to seek approval, that the labs would be repeated in three months, and that Ryan should follow up in 3.5 weeks. (Docs. 58-2 at 56; 59-1 at ¶ 28). After Ryan reiterated his complaint of hypogonadism, Dr. Alvarez allegedly informed Ryan that there was nothing he could do. (Doc. 13 at 8). Ryan also "complained that the [pain] medicine still wasn't working and that the brace [provided] for [Ryan's] knee puts pressure on the pedunculated osteochondroma emanating from the posterior aspect of the proximal tibia . . . causing [Ryan] even more pain than without the brace." (*Id.*). Dr. Alvarez purportedly told Ryan he "would have to live with the pain." (*Id.*). On May 3, 2017, Dr. Yelton increased Ryan's Neurontin dosage yet again. (Doc. 58-3 at 5).

Ryan alleges that on May 23, 2017, Poythress showed Ryan that Drs. Alvarez and Kennedy put Ryan on a "deferred status" and had taken a conservative approach to treating his purported hypogonadism. (Doc. 13 at 8.) Ryan "explained all [his] symptoms and pain all over again," and Poythress prescribed Baclofen. (Docs. 13 at 9; 58-2 at 48; 58-3 at 4).

On May 31 and June 8, 2017, Ryan completed a sick call request claiming that his boot was causing ankle pain. (Doc. 58-2 at 42-43). On June 13, 2017, Ryan attempted to "cheek" his Baclofen.[3] (*Id.* at 44). Also, on June 13, 2017, Dr. Alvarez examined Ryan for a shoe pass. Dr. Alvarez noted that Ryan had tenderness over the left tibia. He also noted that there was good range of motion with the ankle, no feet deformities, and no edema. (*Id.* at 41). Dr. Alvarez concluded that there was "no need for medical shoes." (*Id.* at 41).

On June 26, 2017, Ryan's blood was drawn to test his hormone levels and to assess Neurontin levels. (Docs. 58-2 at 40; 58-3 at 4). On June 28, 2017, Dr. Alvarez reviewed the lab reports, which indicated that the FSH and LH were within a normal range and the prolactin had increased to 18. (Docs. 58-2 at 39; 59-1 at ¶ 30).

On July 6, 2017, Dr. Alvarez reviewed Ryan's chart and noted the need to follow-up on Ryan's lab results. (Docs. 58-2 at 38; 59-1 at ¶ 31). On July 31, 2017, Dr. Alvarez reviewed the lab results. These results indicated that TSH had increased to 5.63, T4 was 8.0, total testosterone was 641.8, free testosterone had decreased to

---

[3] "Cheeking" refers to the practice of an inmate acting as though he swallowed his medication, but instead temporarily secreting it in his cheek so that he can later remove it, typically to sell the medication to other inmates. *Easley v. Dep't of Corr.*, 590 F. App'x 860, 865 (11th Cir. 2014).

5.3, FSH and LH were unremarkable, and Ryan's prolactin had increased to 18. (Docs. 58-2 at 38; 59-1 at ¶ 31).

On July 31, 2017, Dr. Alvarez saw Ryan at a follow-up appointment to discuss the lab results. At this appointment, Ryan had no acute complaints and no objective complaints consistent with hypogonadism. (Docs. 58-2 at 36; 59-1 at ¶ 33). The assessment was decreased free testosterone and normal total testosterone level, left knee ligaments derangement (ACL/LCL), left tibial osteochondroma, mild sick euthyroid syndrome, and mild elevation of Ryan's prolactin. (Docs. 58-2 at 36; 59-1 at ¶ 33). Dr. Alvarez advised Ryan that he would seek advice from the medical director and advised Ryan to follow up in one month. (Docs. 58-2 at 36; 59-1 at ¶ 33).

On August 30, 2017, Dr. Alvarez submitted an endocrinology consultation request. (Doc. 58-2 at 32, 34; 59-1 at ¶ 34). Dr. Alvarez indicated that physical findings were normal secondary genital expression. (Doc. 58-2 at 32, 34; 59-1 at ¶ 34). Dr. Alvarez indicated that the laboratory findings indicated that "LH 6.4. FSH 2.7, prolactin Level 14.8 Testosterone Level Total 624.6, Free 10.1 (8.5 1/12/2017)." (Doc. 58-2 at 32, 34; 59-1 at ¶ 34).

On August 31, 2017, Dr. Alvarez again examined Ryan. At this appointment, Ryan did not have acute complaints, but he requested a different knee brace. (Doc.

58-2 at 30). Dr. Alvarez discussed with Ryan the lab results and advised Ryan of a pending request for a consultation with an endocrinologist. Dr. Alvarez directed Ryan to follow up in one month. (*Id.*).

On September 11, 2017, the medical director approved an endocrinology consultation, and the FDC transferred Ryan to the Reception and Medical Center ("RMC"). On October 4, 2017, the endocrinologist, Dr. Miguel Roura, M.D., examined Ryan. (Docs. 58-2 at 33; 59-2 ¶¶ 34-35). Dr. Roura's notes documented the June 2017 lab results, including the low free testosterone and high prolactin, and that Ryan had previously received Clomid. (Docs. 58-2 at 33; 59-1 at ¶ 38; 59-2 at ¶ 35). Dr. Roura's assessment was that Ryan's hormone levels were within a normal range and he ordered blood to be drawn for further analysis. Dr. Roura agreed with Dr. Alvarez's assessment that no further treatment was necessary. (Docs. 58-2 at 33).

On October 16, 2017, Dr. Anandjiwald saw Ryan at RMC for a follow-up appointment regarding the October 4 lab results and to address Ryan's complaint of left knee pain. (Doc. 58-2 at 15). Dr. Anadjiwald noted that Ryan's gait was normal and Ryan had "normal Total Testosterone and Free Testosterone." The treatment plan simply was to follow-up with a primary care physician. (*Id.*).

On October 26, 2017, Ryan returned to Graceville. On October 27, 2017, Poythress reviewed the chart and endocrinology consult and noted that no treatment was necessary. (Doc. 58-2 at 7-8; 59-2 at ¶ 42). On November 1, 2017, Poythress saw Ryan to discuss the endocrinology assessment and plan. (Doc. 58-2 at 2; 59-2 at ¶ 43). Ryan indicated he was not interested in returning to RMC. (Doc. 58-2 at 2). Poythress explained that the assessment was hypogonadism secondary to steroid use—stable with no treatment indicated per the endocrinologist. (Doc. 58-2 at 2; 59-2 at ¶ 43). Ryan was advised to return to the clinic as needed.

## III.   Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail on a motion for summary judgment, the moving party must show that the nonmoving party has insufficient evidence to support his case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53 (1986). If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.*

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S. Ct. at 2510. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*; *see Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) ("The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.").

The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See Celotex Corp.*, 477 U.S. at 331, 106 S. Ct. at 2557; *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir. 1997). Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); *Jones v. Cannon*, 174 F.3d 1271, 1282 (11th Cir. 1999).

## IV.    Discussion

Defendants have moved for summary judgment on two grounds: (1) Ryan has failed to establish that he had a serious medical need; and (2) Ryan failed to establish that Defendants were deliberately indifferent to Ryan's medical needs. (Doc. 60 at 21-22).

The Eighth Amendment prohibits infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. "The treatment a prisoner receives in prison and the conditions under which he is confined" is governed by the Eighth Amendment. *Farrow v. West*, 320 F.3d 1235, 1242 (11th Cir. 2003) (citing *Helling v. McKinney*, 509 U.S. 25, 31, 113 S. Ct. 2475, 2480 (1993)). When "'the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.'" *Helling*, 509 U.S. at 32, 113 S. Ct. at 2480 (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Serv.*, 489 U.S. 189, 199-200, 109 S. Ct. 998, 1005-06 (1989)).

The Supreme Court has held that a "prison official's 'deliberate indifference to the serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.'" *Farrow*, 320 F.3d at 1243 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976) (quotation

marks and citations omitted). In other words, because an inmate "must rely on prison authorities to treat his medical needs," prisons officials have an "obligation to provide medical care" for inmates, and failure to meet that obligation can constitute a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 103, 97 S. Ct. at 290; *see West v. Atkins*, 487 U.S. 42, 56, 108 S. Ct. 2250, 2259 (1988) (noting that a state has "an affirmative obligation to provide adequate medical care" to prisoners). But "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Farrow*, 320 F.3d at 1243 (quoting *McElligott v. Foley,* 182 F.3d 1248, 1254 (11th Cir. 1999) (citation omitted)).

To prevail on an Eighth Amendment claim of deliberate indifference to a serious medical need, a plaintiff must show:

(1) he had a serious medical need;

(2) the defendant was deliberately indifferent to that need; and

(3) there is a causal connection between the defendant's act or omission and the constitutional deprivation.

*Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016); *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009); *Rodriguez v. Sec'y, Dep't of Corr.*, 508 F.3d 611, 625 (11th Cir. 2007); *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). This standard includes an objective component—"that the deprivation was

serious enough to constitute cruel and unusual punishment"—and a subjective component—deliberate indifference. *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012); *Taylor*, 221 F.3d at 1257. Thus, courts "considering a prisoner's claim must ask both if 'the officials act[ed] with a sufficiently culpable state of mind' and if the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995, 999 (1992) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 303, 111 S. Ct. 2321, 2324, 2326 (1991)).

### A.   <u>Serious Medical Need</u>

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow*, 320 F.3d at 1243 (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)); *Mann*, 588 F.3d at 1307. In either of those cases, the medical need is serious if it is "one that, if left unattended, 'pos[es] a substantial risk of harm.'" *Farrow*, 320 F.3d at 1243 (citing *Taylor*, 221 F.3d at 1258); *Mann*, 588 F.3d at 1307.

### 1.   *Alleged Hypogonadism*

With regard to Ryan's alleged hypogonadism, there is no evidence of an objectively serious medical need. "Hypogonadism is a condition in which the male testes or the female ovaries produce little or no sex hormones." *O'Brien v. Michigan*

Page 22 of 37

*Dept. of Corr.*, 592 F. App'x 338, 340 (6th Cir. 2014). Thus, in men, hypogonadism results in substantially reduced levels of testosterone. *Endo Pharm. Solutions, Inc. v. Custopharm Inc.*, 894 F.3d 1374, 1376 (Fed. Cir. 2018). Hypogonadism, therefore, can sometimes constitute a serious medical need, if the quantity of a man's testosterone level is significantly reduced.[4] It is unclear from the medical records, however, whether Ryan actually suffered from hypogonadism. Some of his records indicate that he did not have primary or secondary hypogonadism, some indicate that he potentially had hypogonadism (based on Ryan's purported medical history), and others indicate that, at worst, any hypogonadism was "stable." (Doc. 58-2 at 2, 61, 63, 65, 71). Taking the evidence in the light most favorable to Ryan's claim, the undersigned will presume that Ryan suffered from hypogonadism.

The undisputed evidence, however, indicates that Ryan's purported hypogonadism was stable without medical intervention. Defendants and an

---

[4] Hypogonadism is treated with synthetic testosterone, which may be taken orally or by injection. Because increased testosterone levels can increase the body's ability to synthesize skeletal muscle tissue, individuals seeking greater muscle mass have an incentive to abuse testosterone. *See generally United States v. Bader*, 678 F.3d 858, 864 (10th Cir. 2012); Harrison G. Pope, et al., *Adverse Health Consequences of Performance-Enhancing Drugs: An Endocrine Society Scientific Statement*, 35(3) ENDOCRINE REV. 341, 342, 348 (2014). Anabolic-androgenic steroids are Schedule III controlled substances. *See* 21 U.S.C. § 812(c). Prison medical personnel, therefore, must exercise a healthy dose of skepticism when prisoners claim a need for anabolic steroids.

endocrinologist—among other medical professionals—examined Ryan on several occasions and determined that Ryan did not have the objective symptoms of hypogonadism (*e.g.,* hair loss, growth problems, fatigue, muscle loss, erectile dysfunction, or arthralgia other than his knee pain). (Docs. 59-1 at ¶¶ 22, 33; 59-2 at ¶ 17). Additionally, Defendants and the endocrinologist analyzed Ryan's blood on at least five separate occasions—over a ten-month period—to determine his level of total and free testosterone and ensure that he was not suffering from low testosterone. (Docs. 58-2 at 40, 66, 85, 93; 58-3 at 4, 8; 58-4). These lab analyses indicated that Ryan's testosterone levels were appropriate for his age.

Based on Ryan's normal testosterone levels and Ryan's lack of objective symptoms of hypogonadism, prison medical personnel determined that no treatment was necessary. (Docs. 58-2 at 2, 8, 33; 59-1 at ¶ 14; 59-2 at ¶¶ 16, 22, 40). The undisputed evidence that the alleged hypogonadism did not require treatment, therefore, indicates that Ryan's alleged hypogonadism did not constitute a serious medical need. *See Farrow*, 320 F.3d at 1243 (holding that a serious medical need is "one that has been diagnosed by a physician as mandating treatment . . . ."). Indeed, without any treatment, Ryan's testosterone levels remained within the normal range and medical personnel did not see objective evidence of hypogonadism during the

relevant timeframe. (Doc. 59-1 at ¶¶ 14, 16, 22-23, 25, 32-33, 38, 40; Doc. 59-2 at ¶¶ 14-17, 21-22, 29, 37).

   2.   *Knee Pain*

As to his knee pain, taken in the light most favorable to Ryan, the evidence showed that:

- Ryan had chronic left knee pain and the prescribed knee brace put pressure on an osteochondroma.

- On January 5, 2017, Ryan requested Ibuprofen for pain. (Doc. 58-2 at 92).

- On January 10 and 11, 2017, Ryan reported having a pain level of ten out of ten. (*Id.* at 87, 90).

- On January 11, 2017, Ryan experienced mild swelling of his knee. (*Id.* at 87).

- On February 24, 2017, Ryan reported a pain level of six out of ten, but there was no swelling. (*Id.* at 68).

- Ryan's left knee made a crunching sound when extended. (Doc. 13 at 7).

- On May 17, 2017, Ryan reported a pain level of five out of ten, but no swelling of the knee. He also could walk, bear weight on the knee, and could bend and straighten the knee. (Doc. 58-2 at 51).

Defendants and other medical personnel periodically examined and treated Ryan for knee pain. Ryan's medical records indicate that he enjoyed full range of motion in his knee, no deformities, and had a steady gait. (Doc. 58-2 at 68-69, 83, 87, 121). Additionally, only one medical record indicates that there was "mild swelling" of the joint while the others indicate that no joint swelling was present. (Compare Doc. 58-2 at 60, 68, 83, 121 with Doc. 58-2 at 87).

The Eleventh Circuit has held that chronic pain can constitute a serious medical need when left untreated. *See Hinson v. Bias*, 927 F.3d 1103, 1122 (11th Cir. 2019) (holding that "severe pain that is not promptly or adequately treated can present a serious medical need"); *McElligott*, 182 F.3d at 1256 (holding that severe abdominal pain constituted a serious medical need); *Farrow*, 320 F.3d at 1244-45 (holding that pain from teeth cutting into gums was a serious medical need). Additionally, the Second Circuit has noted that a "serious medical need" exists when the magnitude of an inmate's chronic pain falls "between 'annoying' and 'extreme.'" *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003). Because Ryan reported that his

chronic knee pain sometimes entailed extreme pain, the undersigned will assume that Ryan's knee pain sometimes constituted a serious medical need.

### 3.   *Migraine Headaches*

Ryan also claimed that the pain caused by migraine headaches constituted a serious medical need. But neither Ryan's claim nor his medical records provide much detail regarding the frequency, severity, and duration of Ryan's migraine headaches. At most, taken in the light most favorable to Ryan, the evidence showed that:

- Ryan filed three sick-calls relating to migraines. (Doc. 58-2 at 53, 70, 80).

- After Ryan's second sick-call request,[5] Nurse Bryson examined Ryan for the purported migraines. Ryan reported that he did not have a migraine at that time. Nurse Bryson noted that there was "nothing found in record of migraines." (Doc. 58-2 at 79).

- Dr. Alvarez prescribed Excedrin for the migraines.

Migraine pain sometimes can be debilitating and may require treatment by a physician. Thus, it is possible for intense migraine headaches to constitute a "serious

---

[5] Plaintiff refused to be seen for sick call after his first sick-call request relating to his migraines. (Doc. 58-2 at 83).

medical need." *See Clas v. Torres*, 549 F. App'x 922, 924 (11th Cir. 2013) (accepting Clas's allegations of intense migraine-like symptoms as demonstrative of a serious medical need); *Miller v. Beard*, 699 F. Supp. 2d 697, 712 (E.D. Penn. 2010) ("An inmate might be able to demonstrate that migraine headaches rise to the level of a serious medical need that a lay person would recognize, but only if the inmate can provide evidence that the migraines are disabling."). Accordingly, in light of the posture of this case, the undersigned will assume that Ryan's migraine headaches sometimes constituted a serious medical need.

### B.   Failure to Demonstrate Deliberate Indifference

To prevail on an Eighth Amendment claim that medical personnel provided inadequate medical care, a plaintiff must show that a defendant acted with "deliberate indifference" to his "serious medical needs." *Estelle*, 429 U.S. at 104, 97 S. Ct. 291; *see Hudson*, 503 U.S. at 5, 112 S. Ct. at 998 ("[T]he appropriate inquiry when an inmate alleges that the prison officials failed to attend to serious medical needs is whether the officials exhibited 'deliberate indifference.'"); *Taylor*, 221 F.3d at 1258 ("[T]o show the required subjective intent to punish, a plaintiff must demonstrate that the public official acted with an attitude of 'deliberate indifference.'"). Deliberate indifference is a higher standard than simple negligence and entails three components: "(1) subjective knowledge of a risk of serious harm;

(2) disregard of that risk; (3) by conduct that is more than mere negligence." *Farrow*, 320 F.3d at 1245 (citing *McElligott*, 182 F.3d at 1255); *Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (citing *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)); *Goodman v. Kimbrough*, 718 F.3d 1325, 1331-32 (11th Cir. 2013).

"Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) (citing *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004)). "An official disregards a serious risk by more than mere negligence 'when he or she knows that an inmate is in serious need of medical care, but he or she fails or refuses to obtain [or intentionally delays] medical treatment for the inmate.'" *Nam Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017) (citations omitted).

A complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference. *Harris v. Coweta*, 21 F.3d 388, 393 (11th Cir. 1994). But "where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Harris v. Thigpen*, 941 F.2d 1495, 1507 (11th Cir. 1991) (quoting

*Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). Thus, a mere difference of opinion between a doctor and an inmate as to the inmate's diagnosis or course of treatment does not establish deliberate indifference. *Id.* at 1505. "When an inmate has, in fact, received medical treatment, there will be a violation of the Eighth Amendment, only when the treatment was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id.*

### 1.   *Alleged Hypogonadism*

As indicated above, Ryan's alleged hypogonadism did not rise to the level of a serious medical condition.  Even if it had, however, Ryan failed to demonstrate that Dr. Alvarez and Poythress exhibited deliberate indifference to his purported hypogonadism. The evidence, taken in the light most favorable to Ryan, shows that he received extensive medical care for his claimed hypogonadism. Over a ten-month period, Dr. Alvarez and Poythress examined Ryan approximately eight times for subjective complaints related to hypogonadism. During physical examinations, Dr. Alvarez and Poythress noted that Ryan did not have the objective symptoms of hypogonadism. Additionally, they ordered diagnostic testing (blood analysis) approximately every three months to monitor Ryan's testosterone levels. These lab analyses indicated that Ryan's testosterone levels were within a normal range. Based

on the objective examinations and lab results, Dr. Alvarez and Poythress made clinical determinations that the appropriate care plan was to monitor Ryan's testosterone levels closely and to schedule follow-up appointments.

Additionally, despite these normal findings, Dr. Alvarez twice referred Ryan to an endocrinologist for a consultation. As a result of these requests, Ryan was examined by an endocrinologist, Dr. Roura.

Two independent physicians also reached the same conclusion as Dr. Alvarez and Poythress. Dr. Roura, the endocrinologist, concluded that Ryan's alleged hypogonadism was stable. Additionally, Dr. Roura recommended the same treatment plan as Dr. Alvarez and Poythress: periodic testing of Ryan's hormone levels. Consistent with Defendants' conclusions, Dr. Roura concluded that hormone replacement therapy was unnecessary. (Docs. 58-2 at 33; 59-1 at ¶¶ 38-39, 59-2 at ¶¶ 35-36). Like Dr. Alvarez and Dr. Roura, Dr. Anandjiwald found that Ryan's October 4, 2017, lab results indicated "normal total testosterone and free testosterone" and the plan was to "follow up with his primary care physician" at the correctional institution. (Doc. 58-2 at 15).

To the extent Ryan alleges that an endocrinologist did not examine him expeditiously, the record shows that the medical director needed to approve the request, which caused a slight delay that had no deleterious effects for Ryan. The

medical director denied the first consult request and placed it on deferred status. The medical director approved the second request, and Dr. Roura promptly examined Ryan within a month of the approved request. Thus, Defendants did not cause any substantial delay in Ryan seeing the endocrinologist. Furthermore, Ryan suffered no harm from this delay insofar as the endocrinologist concluded that Ryan's testosterone levels were normal and hormone replacement therapy treatment was unnecessary.

Ryan disagrees with the diagnoses and recommended treatment plan of Dr. Alvarez, Poythress, Dr. Roura, and Dr. Anandjiwald. But mere disagreement with one physician—much less three physicians and a nurse—is insufficient in itself to establish deliberate indifference. A mere difference in medical opinion between the prison's medical staff and the inmate as to the diagnosis of a condition or course of treatment is insufficient to demonstrate deliberate indifference to a medical need. *See Harris*, 941 F.2d at 1505; *Sult v. Prison Health Srvs. Polk Cty. Jail*, 806 F. Supp. 251, 252-53 (M.D. Fla. Nov. 9, 1992) ("Whether diagnostic techniques or particular forms of treatment are indicated is a matter for medical judgment. A medical decision not order such measures does not represent cruel and unusual punishment.") (citing *Estelle*, 429 U.S. at 107, 97 S. Ct. at 293). Accordingly, Ryan has failed to

establish any material dispute regarding his claim that Defendants were deliberately indifferent to his claimed hypogonadism.

### 2.    *Knee Pain and Migraines*

As for Ryan's claim of chronic knee pain and migraine headaches, Ryan contends that Defendants ignored his complaints and inadequately treated him because Defendants did not give him pain medication that "touched the pain," and the pain medication Defendants provided posed a danger to Ryan's kidneys. Ryan indicated that he used Percocet, Oxycodone, and Gabapentin for his chronic pain prior to his incarceration at Graceville. (Doc. 13 at 6). Based on the allegations in his amended complaint, Ryan essentially contends that Defendants should have prescribed Ryan his preferred drugs.

The record does not indicate that Defendants ignored Ryan's complaints of chronic pain. Rather, Defendants and other members of prison's medical staff regularly evaluated and treated Ryan for complaints regarding pain in his left knee. At his medical examinations, Ryan generally had full range of movement and no swelling of his knee. Poythress also referred Ryan for x-ray imaging of his left knee. Dr. Alvarez and Poythress prescribed a knee brace and an ace wrap, showed Ryan physical therapy exercises, and instructed Ryan to elevate his leg. Dr. Alvarez also issued a pass for a low bunk, boots, and no prolonged standing greater than 25

minutes. Dr. Alvarez, Poythress, and other prison medical personnel repeatedly prescribed pain medication, including Ibuprofen, Neurontin, and Baclofen.[6] As long as medical personnel treat an inmate with medically-acceptable medications and procedures, the Eighth Amendment does not require prisons to provide prisoners like Ryan with the pain medication of their choice. *See Taylor v. Spraga*, 741 F. App'x 884, 886-87 (10th Cir. 2018) (holding that the plaintiff failed to create a genuine issue regarding deliberate indifference when he established only that he preferred Neurontin and the prison medical staff instead prescribed Motrin); *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (holding that mere disagreement as to the proper medical treatment is insufficient to establish a claim of deliberate indifference to a serious medical need). Ryan has not presented any evidence that the treatment and medication prescribed by Defendants fell below a medically-acceptable standard.

Furthermore, on January 20, 2017, in response to Ryan's complaint that Ibuprofen could damage his kidneys, Poythress discontinued the Ibuprofen and instead prescribed Naproxen. This conduct further suggests that Defendants were

---

[6] According to Ryan's medical records from Shands Jacksonville Medical Center, other physicians previously prescribed "Gabapentin (Neurontin)" for Ryan. (Doc. 58-6 at 6). Thus, to the extent Ryan argues that Defendants failed to provide him with medication that he received prior to his incarceration at Graceville, Ryan ignores the medical records which show that he was receiving Neurontin in increasing dosages from November 15, 2016 through June 26, 2017.

not deliberately indifferent to Ryan's medical needs, but sought to address them promptly and protect Ryan even from potential future harm.

As to Ryan's migraine headaches, Ryan filed two sick call requests in which he complained of migraine headaches.  He submitted the first one on January 29, 2017. On January 31, 2017, Ryan refused sick call services regarding the alleged migraine headaches. (Doc. 58-2 at 83).

On February 1 and February 23, 2017, after submitting sick call requests in which he complained of headaches, when he appeared for treatment, Ryan indicated that he did not have a migraine headache at that time or that his primary complaint was knee pain. (*Id.* at 68-69, 79). In response, the nurses indicated that headaches would be discussed at the follow-up appointment and advised Ryan to take Motrin or Acetaminophen for any pain. On March 9, 2017, Dr. Alvarez provided Ryan with Excedrin. After that, Ryan never again filed a sick call relating to migraine headaches. Viewing the evidence in the light most favorable to Ryan, it is apparent that Defendants and other medical personnel treated Ryan whenever he complained of migraine headaches.

Notations in Ryan's medical records also indicate that he refused sick call on at least seven occasions. Additionally, he refused all of his medication at least once, and there is evidence that Ryan attempted to "cheek" his Baclofen. That is, he tried

to deceive prison staff into believing that he had consumed his medication, which sometimes is done so that prisoners can sell their medication.

Ryan's claim that Defendants were indifferent to his headaches and knee pain amounts to little more than a preference for a different course of treatment. A mere disagreement with the treatment provided does not indicate deliberate indifference. *Harris*, 941 F.2d at 1505. Furthermore, a claim that a physician failed to provide a plaintiff's preferred treatment is a "classic example as a matter for medical judgment" and not a basis for liability under the Eighth Amendment. *See Estelle*, 429 U.S. at 107, 97 S. Ct. at 293. Accordingly, Ryan has failed to create a genuine dispute that Defendants refused to treat him or delayed providing medical care to Ryan for his knee pain or migraine headaches.

Because Ryan has failed to establish that there is a genuine issue of material fact regarding his claim of deliberate indifference to a serious medical need, the district court should grant Defendants' motion for summary judgment.

## V.    Conclusion

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that:

1.    Defendant Alvarez and Poythress's Motion for Summary Judgment (Doc. 60) be **GRANTED**.

Page 36 of 37

2.     The clerk of the court be directed to enter judgment in favor of

Defendants.

3.     The clerk of the court be directed to close the case file.

At Panama City Beach, Florida, this <u>20th</u> day of December, 2019.

/s/ *Michael J. Frank*
Michael J. Frank
United States Magistrate Judge


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations may be filed within 14 days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served upon the magistrate judge and all other parties. A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**